NS:KDE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                         Docket No. <u>90–CR–446 (S-4) (FB)</u>

ANTHONY CASSO,
       also known as "Gaspipe,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Keith D. Edelman
Assistant U.S. Attorney
   (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The defendant Anthony "Gaspipe" Casso pleaded guilty to 74 counts of conviction—specifically, racketeering and racketeering conspiracy, 16 counts of conspiracy to commit murder in-aid-of racketeering, 11 counts of substantive murder in-aid-of racketeering, 34 counts of bribing labor officials, one count of conspiracy to bribe labor officials, five counts of conspiracy to commit extortion, and one count of conspiracy to defraud the United States. Following his failed cooperation – which involved assaulting a fellow inmate, smuggling in contraband, bribing Bureau of Prisons officials, and providing false information to try to discredit other cooperating witnesses – this Court sentenced the defendant to 13 concurrent terms of life in prison.

Casso now requests that the Court release him because he ███████████ ██████████ Although the government does not diminish the seriousness of ████████ it respectfully submits that Casso cannot establish any "extraordinary and compelling" circumstances warranting relief.  Even if he could, Casso – who admitted to committing over 25 murders – poses a danger to the community if his health situation improves.  Finally, because the applicable sentencing factors in 18 U.S.C. § 3553(a) weigh against release – most notably the nature and circumstances of the offenses, the need to protect the community from further crimes by Casso, and the need to promote respect for the law and provide just punishment for the offense – the motion for early release must be denied and Casso should continue to serve the sentence originally contemplated, required by statute, and imposed by the Court – life in prison.

<u>BACKGROUND</u>

I.    <u>The Offenses of Conviction</u>

As this Court is well aware, on April 12, 1993, a grand jury in the Eastern District of New York returned a 72-count superseding indictment (the "Indictment") charging Casso and others with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), in connection with their membership in and leadership of the Luchese organized crime family of La Cosa Nostra (the "Luchese crime family"). On March 1, 1994, Casso pleaded guilty, pursuant to a cooperation agreement, to Counts One, Two, and Five through Seventy-Two of the Indictment. (<u>See</u> ECF Dkt. No. 475). As Casso has admitted, since approximately 1978, Casso was associated with the Luchese crime family, eventually rising the ranks from soldier to captain, consigliere and, beginning in approximately 1990, underboss, supporting boss Vittorio "Vic" Amuso. (<u>See</u> Presentence Investigation Report ("PSR") ¶ 37).

Set forth below is a brief summary of the murders Casso committed, or ordered to be committed, that were set forth in the Indictment:

- <u>Murder of Angelo Sigona</u> (Racketeering Act 2, Counts 5 and 6): Angelo Sigona dated the daughter of Casso's neighbor. The neighbor approached Casso to ask Casso to kill Sigona because his daughter did not want to date Sigona any longer, and because Sigona continued to harass her. Casso received permission from Amuso to kill Sigona, and assigned the murder contract to captain Peter Chiodo, who in turn assigned it to Richard Pagliarulo and Michael DeSantis. On December 7, 1988, Sigona was discovered shot to death in a car in Brooklyn. (<u>See</u> PSR ¶ 45).

- <u>Murder of Michael Pappadio</u> (Racketeering Act 3, Counts 7 and 8): Michael Pappadio was a long-time member of the Luchese crime family. For many years, Pappadio had monitored the Luchese crime family's interest in the garment district. Pappadio's job was to monitor labor racketeering, extortion, and loansharking operations within the district. Sidney Lieberman was a Luchese crime family associate who was close to Casso and Amuso.

  In 1988, a dispute emerged between Pappadio and Lieberman, each accusing the other of taking business from the Luchese crime family. Pappadio complained that Lieberman was trying to push him (Pappadio) out of the garment district. At a

subsequent meeting between Casso, Amuso, and others, Pappadio was told by Amuso and Casso to stop causing problems in the garment district. After Pappadio continued to refuse directions from Amuso and Casso, they, together with others, planned to kill Pappadio.

On May 13, 1989, Pappadio was lured to a Crown Bagel in Queens. When he entered, Alphonse D'Arco hit him several times, and Luchese crime family member George Zappola shot Pappadio in the head multiple times. Pappadio was then placed in a body bag and put in Zappola's car. Zappola and D'Arco drove to Woodhaven Boulevard and Metropolitan Avenue in Queens, where they met with someone who cremated the body. After the murder, Casso and Amuso told D'Arco in a telephone conversation, "Good job." (PSR ¶ 46-50).

- <u>Murder of Julius Calder</u> (Racketeering Act 4, Count 9): Ralph Gigante, a high level figure in the Genovese crime family, asked Casso to locate Julius Calder so he could be killed. Casso offered to kill Calder himself, but first asked for permission from Genovese crime family boss Vincent "The Chin" Gigante, which was granted. Although Casso did not personally commit the murder, he supervised its commission, which occurred on June 2, 1989. (PSR ¶ 51).

- <u>Murder of John Petrucelli</u> (Racketeering Act 5, Counts 10 and 11): In 1989, Bonanno crime family associate Gus Ferrace killed Special Agent Everett Hatcher of the Drug Enforcement Administration. During the ensuing manhunt, La Cosa Nostra families decided that no one was to aid Ferrace's escape. At one point, John Petrucelli, a Luchese crime family soldier, bragged that he was hiding Ferrace, which prompted Casso and Amuso to order that Petrucelli kill Ferrace. When Petrucelli refused, Casso and Amuso ordered the murder of Petrucelli, which occurred on September 13, 1989, when Petrucelli was shot to death outside of his apartment building. (PSR ¶ 52).

- <u>Murder of John "Sonny" Morrissey</u> (Racketeering Act 6A, Counts 12 and 13): John "Sonny" Morrissey was a shop steward in Local 580 of the Architectural and Ornamental Ironworkers Union, and collected Amuso's payoffs relating to the Luchese crime family's participation in the New York City Housing Authority windows replacement scheme (the "Windows Case"). Before Morrissey was indicted for his criminal activities, Amuso was worried he might cooperate with the government and therefore ordered he be killed. Amuso and Casso agreed and assigned the murder contract to Chiodo, who kept Casso apprised of the efforts to locate and kill Morrissey. Ultimately, on September 17, 1989, Thomas Carew and Richard Pagliarulo, under Chiodo's supervision, shot and killed Morrissey at a land development site in New Jersey. After the first shot, Morrissey pleaded for his life, stating, "I am not a rat." Pagliarulo and Chiodo shot Morrissey numerous times, killing him, and buried him on the land site. (PSR ¶ 59).

- <u>Murder of Michael Salerno</u> (Racketeering Acts 9, Counts 18 and 19): Michael Salerno was a prominent member of the Luchese crime family from the Bronx who was close with boss Anthony "Tony Ducks" Corallo. After Corallo's imprisonment

4

and selection of Amuso to become boss, Casso and Amuso discovered that Salerno was stealing money from the crime family's collection from the garbage disposal business. Casso and Amuso also discovered that Salerno was meeting with other high-level Luchese crime family members.

When Casso and Amuso fled to avoid prosecution for the "Windows Case," they ordered that Salerno be killed to avoid him gaining power within the crime family. Casso and Amuso assigned the murder contract to D'Arco. In June 1990, Salerno was lured to an auto repair shop and shot through the heart and stabbed in the throat. (PSR ¶ 65-66).

- Murder of Bruno Facciola (Racketeering Act 10, Counts 20 and 21): Casso learned that Bruno Facciola, a Luchese crime family soldier, had become a government informant. Casso informed Amuso, who ordered that Facciola be killed. On August 24, 1990, Facciola was lured to an auto body shop. Upon realizing he was about to be killed, Facciola tried to escape but was dragged back inside and shot and stabbed to death. A dead canary was then placed in Facciola's mouth to serve as a warning to anyone else who might attempt to cooperate with the government. After the murder, Frank Lastorino, a Luchese crime family soldier, reported back to Casso and Amuso that Facciola had been killed. (PSR ¶ 68).

- Murder of Larry Taylor and Al Visconti (Racketeering Acts 11A, 11B and 12 and Counts 22, 23 and 24): Larry Taylor and Al Visconti, Luchese crime family associates, were close friends of Bruno Facciola. Following Facciola's murder, Taylor and Visconti planned to avenge his death. Upon learning this, Casso and Amuso ordered that Taylor and Visconti be killed. On February 5, 1991, Taylor was shot to death in his car in Brooklyn. On March 26, 1991, Visconti was shot in the head and the groin in the lobby of his apartment building in Brooklyn. (PSR ¶ 68).

- Murder of Anthony Fava (Racketeering Act 14, Counts 27 and 28). Casso and Amuso became concerned that Anthony Fava, a Luchese crime family member, could harm them if he decided to cooperate with the government. Therefore, Casso and Amuso ordered that Fava be killed, which occurred when subordinates stabbed Fava to death. (PSR ¶ 71).

- Murder of Robert Kubecka and Donald Barstow (Racketeering Acts 15A, 15B and 16, Counts 29, 30 and 31): In late 1988 and 1989, Salvatore Avellino, a Luchese crime family member, wanted Robert Kubecka and his brother-in-law Donald Barstow killed because they had rebuffed Avellino's attempts to extort and control their carting company. Kubecka and Barstow also testified in a New York state criminal investigation regarding Avellino and the extortion; Kubecka was deposed in connection with a civil racketeering action filed in the Eastern District of New York regarding the carting industry. This deposition was not concluded. Rather, in April 1989, Avellino and others reported to Casso and Amuso that they wanted Kubecka and Barstow killed, which they claimed Corallo had authorized prior to

his imprisonment. Casso and Amuso agreed that Kubecka and Barstow should be killed, and on August 10, 1989, they were both shot to death. (PSR ¶¶ 72-76).

In addition to this charged conduct, Casso committed myriad other offenses, including a total of over 25 murders. These include:

- Murder of Anthony Bolino: Anthony Bolino was an associate of the Colombo organized crime family of La Cosa Nostra. Casso became angry with Bolino because of a personal dispute and informed Colombo family acting boss Vic Orena that he wanted Bolino killed. Orena indicated he would "take care of it." Casso created his own plan to kill Bolino, but did not have to carry it out because Bolino was shot to death, which Orena reported was done as a favor to Casso. (PSR ¶ 115).

- Murder of Frank Signorino: After Amuso was arrested in July 1991, he sent a message that he was worried about the testimony of cooperating witness Peter Chiodo and wanted to intimidate him by seriously hurting someone close to Chiodo. Amuso contacted Frank Lastorino, the Luchese crime family consigliere, who contacted Casso. Casso, Lastorino and others met and first considered murdering Chiodo's uncle Frank Signorino, but Casso reported that Chiodo was not close with him. They ultimately decided that they should murder another of Chiodo's uncles, Thomas Signorino. But when Thomas Signorino could not be located, it was decided to murder Patricia Cappazola, Chiodo's sister. Ms. Cappazola was shot while in her car, but survived. Frank Signorino was ultimately murdered (although it was not determined if either Casso or Amsuo ordered the killing.) (PSR ¶¶ 116-17).

- Murder of Anthony DiLapi: After Amuso became boss, he summoned Luchese crime family member Anthony DiLapi, but Amuso learned that DiLapi had gone to California. Amuso did not trust DiLapi, who had caused problems within the Luchese crime family hierarchy, and decided to kill DiLapi. Amuso and Casso directed John Petrucelli to locate DiLapi, who was in California. On February 4, 1990, other members of the Luchese crime family shot DiLapi to death. (PSR ¶ 122-123).

- Murder of Frank DeCicco: In 1986, John Gotti coordinated the murder of Paul Castellano, who was then boss of the Gambino crime family, without obtaining proper permission. As retribution, Casso wanted Gotti and Frank DeCicco, the Gambino crime family underboss under Gotti, to be killed. Casso, Amuso, and Vincent Gigante, the boss of the Genovese crime family, undertook efforts to do so after a previous attempt by Gigante had failed. On April 3, 1986, Casso and Amuso drove to near DeCicco's car and watched Genovese crime family associate Herbie Pate, an expert in the use of explosives who created a bomb out of C-4, place a bomb on DeCicco's car. When DeCicco entered the vehicle, Pate detonated the bomb, killing DeCicco. Ultimately, given the police presence and high profile of Gotti, a viable plan to kill him could not be executed. (PSR ¶¶ 126-28).

- <u>Murder of James Bishop</u>:  In 1990, James Bishop was scheduled to testify in a case against Casso.  Casso therefore directed Frank Lastorino to murder Bishop.  Lastorino in turn recruited others, who shot Bishop in his car using guns with silencers.  (PSR ¶ 130).

- <u>Murder of Vincent DiPietro</u>:  In 1986, Vic Orena, the Colombo crime family boss, sought permission from Casso and Amuso to murder Luchese crime family associate Vincent DiPietro over unpaid debts.  Casso permitted Orena to do so, stating, "whatever you want to do . . . is okay by us."  Members of the Colombo crime family thereafter murdered DiPietro.  (PSR ¶¶ 132-33).

- <u>Murder of Vincent Albano</u>:  In the mid-1980s, Herbie Pate asked Casso and Amuso for assistance in killing Vincent Albano, a Genovese crime family associate with whom Pate had had many disagreements.  Casso, Amuso and Pate came up with a plan in which Casso and Albano would meet at a pizza parlor and Casso would shoot him.  Albano was successfully lured to the pizza parlor, and Casso had a gun hidden under his shirt, but there were too many witnesses and Casso did not shoot him.  Several days later, Pate asked Casso to meet him, and found Albano's dead body in a car.  (Pate stated Albano had assaulted him.)  Casso followed Pate to Staten Island, New York, to dispose of the body.  They left the body in a car in the parking lot of a medical building; the body was not discovered for several days.  (PSR ¶¶ 134-37).

- <u>Murder of Lee Schleifer</u>:  In the mid-1970s, Christy Furnari, Luchese crime family consigliere, requested that Casso kill suspected cooperating witness Lee Schleifer.  Casso lured Schleifer to a social club operated by Bonanno crime family soldier Ronnie Carlucci, where Schleifer was forced to the floor and handcuffed.  Casso then drew a .22 caliber handgun equipped with a silencer and shot Schleifer to death.  (PSR ¶ 141).

- <u>Murder of Johnny Coiro and Tommy Barbusca</u>:  In the 1970s, Johnny Coiro, an associate of the Colombo crime family, had a dispute with Alphonse Persico, then a member of the Colombo crime family.  Persico went to Furnari for help in killing Coiro, and because Casso and Amuso knew Coiro, they volunteered for – and were awarded – the contract to kill Coiro.  Thereafter, Casso and Amuso waited for Coiro to exit a club, which he did with Tommy Barbusca.  Casso drove up to them and Amuso shot both men to death with a shotgun.  Casso then drove away and then abandoned the car, which had been stolen.  (PSR ¶¶ 142-43).

Casso was also part of many other murder conspiracies and attempted murders throughout his years as an associate or member of the Luchese crime family, which are described in the PSR and not set forth in detail herein.  Of note, Casso was a member of two murder plots aimed at government officials.  Specifically, between 1992 and 1993, while Assistant United States

Attorney ("AUSA") Charles Rose was prosecuting Casso, a story regarding Casso's wife was printed by the press, which included allegations of adultery by Casso's wife, and Casso believed that AUSA Rose had leaked the story to the press. As a result, Casso directed multiple individuals, including two corrupt New York City Police Department detectives (described more below), to find AUSA Rose's home and kill him. Several efforts were made to do so, but they could not locate AUSA Rose, and the murder never came to pass. (PSR ¶ 124).

Casso also conspired to murder the Honorable Eugene Nickerson, who was presiding over Casso's case. To force a mistrial or at least a delay, Casso assisted members and associates of the Colombo crime family, who discussed hiring individuals to conduct surveillance on Judge Nickerson and murder him. Casso learned which commuter train stop was used by Judge Nickerson at that time and volunteered that information to the others with whom he had been discussing the murder. The plan involved murdering Judge Nickerson in the vicinity of the train station, as opposed to on the train, but it did not come to pass. (PSR ¶ 125).

Casso's crimes were not limited to murder and included scores of other offenses, both violent and non-violent. For instance, Casso was a key participant in various extortion schemes, including the scheme to control the installation of replacement windows at New York City Housing Authority buildings (the "Windows Case"), which involved over $150 million in illegally obtained contracts as well as payoffs to labor unions. (PSR ¶¶ 77-94). Casso employed two corrupt New York City Police Department detectives, who, among other things, performed acts of murder and also gave Casso information about police activity, which, among other things, permitted him to become a fugitive in May 1990 to try to avoid prosecution for the "Windows Case." (PSR ¶¶ 40, 159). Casso was also involved in (i) multiple attempted murders, shootings and other violent acts; (ii) multiple extortions of businesses, particularly in the carting industry;

(iii) bribing a correctional officer by paying him $200,000 (with a promise of $800,000 more) in exchange for contraband as well as materials to be used in an escape, including civilian clothes and a key (which were provided to Casso but not used because the officer changed his mind); (iii) a separate escape plot in which Casso sought to have other Luchese crime family members attack the van carrying Casso to court (which did not come to fruition because Amuso directed it not occur); and (iv) multiple bank burglaries. (PSR ¶¶ 155-60).

II.    Failed Cooperation

As mentioned above, Casso pleaded guilty to all the crimes alleged against him pursuant to a cooperation agreement, and thereafter provided prosecutors and agents with information about crimes committed by him and others. But Casso breached his cooperation agreement in multiple ways. For instance, while incarcerated, from at least 1994 to 1997, Casso bribed prison guards to smuggle in liquor, food, and articles of clothing. (PSR ¶ 157). Casso also severely assaulted another cooperating witness, beating him while he was naked and handcuffed. (PSR ¶ 158). Casso also destroyed Bureau of Prisons property and lied about it. Finally, Casso also breached his cooperation agreement by providing false information about other witnesses who had testified in the trial against Gigante, specifically, Salvatore Gravano (former Gambino crime family underboss) and Alphonse D'Arco (former Luchese crime family acting boss).

The government ultimately breached Casso's cooperation agreement. Casso challenged this decision, filing a motion with this Court seeking to force the government to file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) on his behalf. On June 29, 1998, the Court denied this motion, concluding:

> The government should not be required to turn a blind eye to criminal conduct by cooperating witnesses merely because such conduct, when considered in connection with past misdeeds, may not materially alter the jury's view of such a witness, or because

> other criminals may have engaged in similar conduct. Simply put, criminal behavior by cooperators should be condemned, not condoned, and repudiation of the government's obligations under a cooperation agreement is an effective means of delivering such an important message.

9 F. Supp. 2d 199, 206 (E.D.N.Y. 1998).

III.     Sentencing and Appeals

Because Casso had breached his agreement, he faced a mandatory minimum of life in prison for the 11 convictions for murder in-aid-of racketeering. On July 8, 1998, the Court sentenced Casso principally to 13 concurrent terms of life in prison, which does not permit the possibility of parole. (See ECF Dkt. Nos. 1140, 1141). Casso appealed, challenging, among other things, the Court's denial of his motion to compel the government to file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), which could permit the Court to impose a sentence less than life. On April 28, 1999, the Second Circuit rejected all of Casso's arguments. See United States v. Gigante, 173 F.3d 847 (2d Cir. 1999).

Casso subsequently filed a motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, arguing that his counsel had several conflicts of interest. The Court denied this motion on November 20, 2001. See Casso v. United States, 2001 WL 1517537 (E.D.N.Y. Nov. 20, 2001).

IV.     The Instant Motion

On November 10, 2020, Casso, through counsel, filed the instant motion for compassionate release under 18 U.S.C. § 3582(c). (See Mot., ECF Dkt. No. 1208). In asserting that "extraordinary and compelling reasons" warrant his release, Casso reports that ███████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ requires his immediate release and placement on home confinement. According to Casso, he was

"sentenced to life in prison. He was not sentenced to death," and therefore the instant motion should be granted. (Mot. at 2).

ARGUMENT

As detailed below, Casso's motion fails for three, independent reasons: (i) although the government agrees that ███████████████████████, in light of the Court's sentence, he cannot establish "extraordinary and compelling reasons" warranting immediate release; (ii) Casso remains a danger to the community if his medical condition improves; and (iii) even if Casso could establish "extraordinary and compelling reasons," the applicable Section 3553(a) sentencing factors outweigh any such reasons.

I. Applicable Law

    A. "Extraordinary and Compelling Reasons"

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, under which Casso seeks relief, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons." Id. § 3582(c)(1)(A)(i). A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[1]

---

[1] Casso filed a motion for compassionate release with the Warden of USP Tucson, where he is incarcerated, which was denied on September 17, 2020. (See Def. Mot., Ex. C). Because more than 30 days have passed since Casso's request, the government agrees that Casso has exhausted his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A).

11

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13. That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id. § 1B1.13 app. n.1.

The Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner. See id.; see also United States v. Traynor, No. 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304). The Second Circuit recently held that a district court erred when it decided that the Guidelines limited a court's ability to consider releasing a defendant early, without input from the BOP, on any grounds beyond a showing of poor health, old age and family care needs, instead concluding that district courts can consider "any potentially extraordinary and compelling reasons that a defendant might raise for compassionate release." United States v. Zullo, No. 19-3218 (2d Cir. Sept. 25, 2020).[2]

---

[2] The government respectfully submits that Zullo was wrongly decided and notes the United States Attorney's Office for the District of Vermont filed a petition for rehearing en banc on November 9, 2020. As set forth in the government's brief to the Second Circuit in Zullo and in its petition for rehearing en banc, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

B.     Dangerousness

Even if a defendant can establish "extraordinary and compelling reasons," to merit compassionate release, the defendant must also demonstrate that he "is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g)." U.S.S.C. § 1B1.13, app. n.1; see also United States v. Santiago, No. 92-cr-563 (BMC), 2020 U.S. Dist. LEXIS 85539, at *5 (E.D.N.Y. May 12, 2020) (noting that "any early release would be predicated on a finding that the defendant is not a danger to the safety of any other person or to the community" (internal quotation marks omitted)). Section 3142(g), in turn, which generally applies in the pretrial context, sets out the following factors that the Court must consider in determining whether the defendant is a danger to the safety of any other person or to the community:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of

---

release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13. In any event, even under Zullo, the motion should be denied for the reasons set forth herein.

> residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In assessing dangerousness, organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. Because organized crime defendants are career criminals who have pledged their loyalty to an illegal enterprise, they pose a distinct threat to commit additional crimes if released. As the court in United States v. Salerno, 631 F. Supp. 1364 (S.D.N.Y. 1986), stated in ordering the detention of two leaders of the Genovese organized crime family:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

Id. at 1375. In short, the danger posed by mob leaders is not only that they will personally engage in acts of violence, but that they "can command others to do so." United States v. Gioeli, No. 08-CR-240 (BMC), 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (quoting Gotti, 2020 WL 497987, at *9).

C.	Section 3553(a) Factors

Even if a court finds "extraordinary and compelling reasons" making a defendant eligible for release, and even if the defendant is not a danger to the community, the 18 U.S.C. § 3553(a) factors still govern whether release is warranted.  See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.  As the court in United States v. Gotti explained:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification.  He is simply eligible for a sentence modification.  The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

2020 WL 497987, at *2.

Therefore, the Court must consider whether, weighed against the purported "extraordinary and compelling reasons," the following factors permit release:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and  (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a).

II.	Argument

A.	Casso Has Failed to Establish Extraordinary and Compelling Reasons Warranting Relief

Casso has failed to satisfy the threshold requirement that there are "extraordinary and compelling reasons" warranting his release and therefore the motion should be denied on this basis.

The government recognizes that Casso is ███████████████████████████████

███████████████████████████████████████ As Casso's updated medical records

show, as of at least November 17, 2020, Casso ██████████████████████████████

████████████████████████████████████████████ (See Ex. A, Med.

Records[3]). Although the government does not minimize the severity of his medical condition, the

fact remains that the Court, as it was required to do, sentenced Casso to spend the rest of his life

in custody.[4]

In light of Casso's sentence, the government respectfully submits that his

circumstances are not "extraordinary and compelling." All defendants sentenced to life in prison

will, at some point, begin to succumb to one disease or another, or suffer from failing health due

to old age. That Casso is █████████████████████████████████████ – a

disease that has killed millions around the globe and over 250,000 in the U.S. alone – does not

transform his case into one that is "extraordinary and compelling."

In urging otherwise, Casso details ██████████████████████████████████

█████████████████████ "exponentially increase his likelihood of experiencing serious and

possibly deadly side effects from the virus." (Mot. at 9). Casso also claims that even if ████████

████████████████████████████████████████████████████████████████

████████ (Id. at 13). Although Casso points to no persuasive evidence showing that ████

███████████████████ the fact remains that none of this separates Casso's case from those of

---

[3] In accordance with the Court's prior order, these records are being submitted under seal under separate cover.

[4] Casso's claim that he was only sentenced to "life in prison," not "death," is beside the point. (Mot. at 2). True, Casso was not executed for the more than 25 murders he committed, and permitted to serve the rest of his life in prison. But each sentence of life in prison – 13 in total – requires Casso's incarceration until his death.

other defendants who were sentenced to life in prison and who must spend the rest of their lives in custody.

      B.      <u>Casso Remains a Danger to the Community</u>

Even if Casso were able to prove that his medical conditions are "extraordinary and compelling reasons" warranting release, the motion for release must be denied because he remains a danger to the community.  <u>See</u> U.S.S.C. § 1B1.13, app. n.1.

Despite the nature of the offenses of conviction, his commission of over 25 murders, his attempts to escape from custody, his plots to murder both the presiding judge and prosecutor, Casso devotes scant reasoning to support his claim that he is no longer a danger to the community.  Casso simply states that "his advanced age and deteriorating health <u>confirm</u> that he no longer poses a danger to the community."  (Mot. at 2 (emphasis added); <u>see also</u> <u>id.</u> at 6 ("[N]or would Mr. Casso's release to home confinement pose a danger to the community, given his elderly age and deteriorating health")).

But this presumes that the dangerousness calculus assesses whether Casso will personally commit an act of violence.  As described above, Casso did not himself personally commit many of the crimes of conviction.  For instance, as underboss, Casso's role was to advise and support the boss (Amuso) in the management of the organization and the myriad crimes it committed.  Indeed, in many of the murders detailed above, neither Casso (nor Amuso) physically pulled the trigger or stabbed the victim.  But Casso's facilitation and participation in murder after murder after murder demonstrate his utter disregard for any semblance of respect for human life, a better predicator of future dangerousness than counsel's conclusory, unsupported claim that Casso "has learned from his nearly quarter century in prison, which has given him time to reflect on the seriousness of his conduct."  (Mot. at 18).  In other words, Casso's danger stems from his

position within the Luchese crime family, a violent, organization that still exists and carries out crimes to further its objectives, and his willingness to end another's life without hesitation.  See generally Salerno, 631 F. Supp. at 1375.  So although Casso is ███████████ ████████████, this does not mean that he cannot have others commit violent crimes on his behalf, as he did time and time again before his arrest.[5]

Judge Cogan's opinion in Gioeli is instructive.  There, the defendant, the former street boss of the Colombo crime family who had been convicted of racketeering conspiracy (including predicate acts of murder), sought release given his positive COVID-19 diagnosis and purported "age and infirmities."  2020 WL 2572191, at *5.  Although the defendant had tested positive for the virus, the court recognized:

> [T]he danger posed by mob leaders, like defendant, is not that these leaders will personally engage in acts of violence, but that they "can command others to do so."  See United States v. Gotti, No. 02-cr-743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates to do their bidding."). The record shows that defendant hurt his knee after playing table tennis. Neither that nor his other medical conditions would stop him from picking up a telephone.

The same is true here.  Although Casso is ███████████████ ████████████████████████████████████████████████████ ███████████████ he will have the ability to direct others to commit crimes, just as he has in the past.  Casso has therefore failed to establish that he is no longer a danger to the community and the motion must be denied.

---

[5] The government understands that Casso's attempts at cooperation, which helped convict multiple other members and associates of organized crime, also affects the future dangerousness calculus.  But Casso demonstrated that he did not fully cooperate with the government, trying to aid other organized crime family members by providing false information about cooperating witnesses.

C.     The Section 3553(a) Factors Require That Casso's Motion Be Denied

Finally, and most importantly, even if Casso presented "extraordinary and compelling" circumstances warranting release, and even if he is no longer a danger, the motion must be denied because the applicable sentencing factors under 18 U.S.C. § 3553(a) outweigh any reasons for release.  See Gotti, 2020 WL 497987, at *2 ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification.  He is simply eligible for a sentence modification.  The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

The "nature and circumstances of the offense[s]" here could not be more serious. See 18 U.S.C. § 3553(a)(1).  Casso, as second-in-command of one of the most violent criminal organizations in the country, committed various crimes on its behalf – including over 25 murders, multiple other attempted murders and murder conspiracies, extortion, bribery, corruption and other offenses.  Indeed, the murders of conviction (and the others, if they had also been charged) are so serious that Congress has decided that regardless of his criminal history or background, a defendant convicted of even one such offense (let alone over 25) must serve the rest of his life in prison or be executed.  See 18 U.S.C. § 1959(a)(1); see also Gioeli, 2020 WL 2572191, at *5 (describing the defendant's "callous disregard for human life" in finding that the Section 3553(a) factors precluded compassionate release).

Casso attempts to whitewash his criminal past, stating only that he was "convicted of murder [singular], racketeering, and extortion, among other crimes," which he allows were "serious offenses" that he claims not to "downplay[]." (Mot. at 2, 17, 18). Casso does not describe the dozens of murders he committed, either personally or by directing others to do so on his behalf, and for good reason. Simply put, Casso's crimes are more than just "serious"—they include over 25 instances of the most serious crime possible, including many against people suspected of cooperating with the government, which Casso committed as part of a violent, ongoing criminal organization. These are in addition to plots to kill a federal judge and prosecutor that thankfully never came to fruition; multiple, serious escape attempts; participating in a vast extortion and bribery scheme that netted millions in illicit proceeds; employing corrupt NYPD detectives to commit murder; fleeing from justice; providing false information about other witnesses; and, when pending sentence, violently assaulting another inmate. Therefore, the "nature and circumstances" of the offenses weigh severely against any form of compassionate release and, in the government's estimation, alone preclude granting the instant motion. 18 U.S.C. § 3553(a)(1); see also United States v. LoCascio, 90-CR-1051 (ILG) (E.D.N.Y. July 17, 2020), ECF Dkt. No. 465, at 11 ("The § 3553 factors were not reviewed with LoCascio when he was sentenced because Congress and the United States Sentencing Guidelines required that the sentence for the crimes of murder for which he was found guilty should be imprisonment for life. The implication is fair that the Congress and the United States Sentencing Commission determined that the sentence they prescribed was not excessive and that it was just.").

Casso also claims that his "characteristics counsel in favor of release" because he is elderly and suffering from ████████████████████████████████████ (Mot. at 18). This recital of his history and characteristics, however, are all relatively recent and ignore

the decades of criminal activity Casso committed, as described above. It also ignores Casso's repeated disciplinary violations while incarcerated, which include: (i) fighting with an inmate (in December 1996); (ii) assaulting another inmate (in February 1997); (iii) fighting with another person (in January 2001); (iv) threatening bodily harm (in December 2001); (v) again threatening bodily harm (in November 2002); (vi) refusing to obey an order (in January 2006); (vii) abusing his phone privileges (in December 2008); and (viii) three times refusing a work assignment (in August and September 2019) (See Ex. B (disciplinary history)). Casso also fails to acknowledge the blatant disregard for the criminal justice system Casso displayed even after his arrest, which included trying to escape from custody, smuggling in contraband, assaulting other inmates and attempting to tamper with other criminal proceedings by lying about multiple witnesses' testimony. For these reasons, Casso's "history and characteristics" also weigh strongly against release.

The need to promote "respect for the law" and provide "just punishment for the offense[s]"—factors Casso does not even address—also requires that the motion be denied. 18 U.S.C. § 3553(a)(2)(A). As described above, Casso's crimes of conviction alone resulted in 13 concurrent life sentences, including 11 that were mandated by Congress. See 18 U.S.C. § 1959(a)(1). These crimes included plots aimed at the integrity of the criminal justice system itself, including escape attempts and conspiracies to murder the presiding judge and one of the prosecutors. When offered the ability to turn away from his life of crime and cooperate with the government (and thereby avoid a life sentence), Casso again displayed his disrespect for the rule of law, concocting false stories against cooperating witnesses who had just testified against the boss of the Genovese crime family. Releasing Casso now would severely undercut respect for the law and would not provide just punishment. See LoCascio, ECF Dkt. No. 465, at 12 ("To grant

this petition would be to depreciate the immeasurable negative impact upon society to which he has devoted his life."); Gioeli, 2020 WL 2572191, at *5 (describing the defendant's "callous disregard for human life" in finding that the Section 3553(a) factors precluded compassionate release).

As Casso is a danger to the community, continued incarceration is required to specifically deter him from committing other crimes. See 18 U.S.C. § 3553(a)(2)(C) (requiring that the Court consider the need "to protect the public from further crimes of the defendant"). Similarly, the need for general deterrence also requires that Casso's motion be denied as others must know that those who commit murder in-aid-of racketeering (let alone over 25 such murders) will receive, and fully serve, a life sentence. See id. § 3553(a)(2)(B); see also Gioeli, 2020 WL 2572191, at *5 (citing the need to "deter others from emulating his behavior").

In urging otherwise, Casso relies heavily on the Honorable Nicholas G. Garaufis's recent decision in United States v. Mongelli, No. 02-CR-307 (NGG), 2020 WL 6449237 (E.D.N.Y. 3, 2020).[6]  There, however, the defendant, who had been convicted of one murder, had been sentenced to 24 years in prison, and had less than three years left when he contracted COVD-19 while suffering from prostate cancer. See id. at *1.  Further, the court reasoned that the defendant's health conditions "undercut the possibility that a longer sentence [of more than two years more in prison] would be necessary to reinforce principles of deterrence." Id. *3.

Here, by contract, Casso was the underboss of the Luchese crime family responsible for over 25 murders, as detailed above.  More importantly, Casso does not have any specific term of imprisonment remaining on his sentence.  The Court directed, as it was required to do, that

---

[6] Casso appears to mistakenly believe that this Court ordered Mongelli's release (see, e.g., Mot. at 10, 19 (referring to "[t]his Court" as delivering the Mongelli decision)), but that case is assigned to Judge Garaufis.

Casso spend the rest of his life in prison. Therefore, the Court is not being asked to decide whether the last small percentage of a sentence is required to serve the goals of sentencing; rather, it is deciding whether to alter that sentence from life to approximately 22 years in prison for the innumerable crimes Casso committed, both before and after his arrest. <u>Mongelli</u>, therefore, is inapposite.

For all of these reasons, the factors set forth in 18 U.S.C. § 3553(a) outweigh the purported "extraordinary and compelling reasons" warranting release, and so Casso's motion must be denied.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that Casso's motion for compassionate release should be denied.

Dated: Brooklyn, New York
November 24, 2020

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By:      /s/
Keith D. Edelman
Assistant United States Attorney
(718) 254-6328

cc:    Clerk of Court (FB) (by ECF)
Defense Counsel (by ECF)